## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

TIM CHAPMAN and KENNETH A.
MODICA, on behalf of themselves
and all others similarly situated,

                         Plaintiffs,

v.

REMINGTON ARMS COMPANY, LLC.,
SPORTING GOODS PROPERTIES, INC.
and E.I. DU PONT NEMOURS AND
COMPANY,

                         Defendants.

_____/

CASE NO.:

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiffs, Tim Chapman and Kenneth A. Modica, by and through undersigned counsel, on behalf of themselves and all other entities and persons similarly situated, sue Defendants Remington Arms Company, LLC. ("Remington"), Sporting Goods Properties, Inc. ("SGPI") and E.I. Du Pont Nemours and Company ("DuPont") (collectively "Defendants") and for their Complaint allege, upon information and belief and based on the investigation to date of their counsel, as follows:

### INTRODUCTION AND SUMMARY OF ACTION

1.       This is a class action asserting unfair and deceptive trade practices in violation of Florida Statutes § 501.201 *et seq.*, strict products liability, negligence, violation of the Magnuson-Moss Act, breach of express warranty, breach of implied warranty of merchantability, fraudulent concealment, unjust enrichment and seeking damages and declaratory relief in connection with

the patented Walker Fire Control (the "Model 700 Rifle" or the "Product"), designed, manufactured, marketed, advertised and sold by Defendants.

2.     The patented Walker Fire Control was introduced in 1948 and is found in excess of 5,000,000 Remington brand firearms.

3.     Defendants designed, manufactured marketed, advertised, warranted and sold the Remington Model 700 bolt action rifle with the patented Walker Fire Control (the "Model 700 Rifle" or the "Product"), to Plaintiffs and the Class as well as the general public. In conjunction with each sale, Defendants advertised that the Product was fit for the ordinary purpose for which such goods were used and was free from defects in materials and workmanship.

4.     As discussed below, Defendants' knowledge of devastating design flaws associated with the Walker Fire Control trigger assembly dates back to before the assembly was ever placed into the stream of commerce.  Defendants' knowledge of the defects associated with the Rifle continued to grow.  Indeed, Defendants have known since 1979 that at least one-percent of all Model 700 Rifles at that time would "trick," allowing them to fire unexpectedly without a trigger pull.    On information and belief, Plaintiffs contend that this percentage is vastly understated and that all Model 700 Rifles are subject to unexpected firing without a trigger pull because of the design defects inherent in the Walker Fire Control trigger assembly which are common to all Models that employ this fire control and the "trick condition" which results in a fire on safe release ("FSR") malfunction is only but one common form of malfunction associated to this design.

5.     Despite decades of knowledge related to the dangerous conditions of the Model 700 Rifle, Defendants never issued an adequate warning or recall of the Model 700 Rifles and

2

Remington continues to falsely represent to the public that the Model 700 is a safe and reliable Rifle.

6.      Following one of the largest settlements ever awarded to an accident victim by a firearm manufacturer's insurance carrier in 1978, Remington opted to recall the Model 600 series rifles once the alleged malfunctions associated to the Walker fire control and the settlement amount were given wide publicity by the media. In 1975, Remington determined that the Model 600 series rifles exhibited a 55.9% failure rate according to their internal testing sample of 615 rifles that were audited. The Model 600 series exhibited the exact forms of safety related malfunctions as claimed herein as the Model 700 bolt action rifle due to the similarity of construction of the fire control systems built under the Patent for the Walker fire control. However, Remington true to form had failed to warn, retrofit or recall these effected rifles until after the Coates settlement in 1978, three (3) years after their internal audit finding. Despite the fact that the Model 600 rifle employed the same Fire Control system developed and protected by the Walker Haskell Patent (Walker Fire Control) it is still used by Defendants in the Model 700 Rifles, Defendants have not recalled all Model 700 Rifles.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2) (diversity jurisdiction) and the Class Action Fairness Act, in that (i) there is complete diversity (Plaintiffs are citizens of Florida, Defendant Remington Arms, LLC is a Delaware corporation with its headquarters/principal place of business in Madison, N.C., Defendant Sporting Goods Properties, Inc. is a Delaware corporation headquartered in Wilmington, Delaware and Defendant, E.I. du Pont de Nemours & Company is a Delaware corporation headquartered in Wilmington, Delaware), (ii) the amount in controversy exceeds

3

$5,000,000.00 (Five Million Dollars) exclusive of interests and costs, and (iii) there are 100 or more members of the proposed Plaintiff class.

8.      Defendants conduct substantial business in Florida, including the sale and distribution of the Remington firearms, and have sufficient contacts with Florida or otherwise intentionally avail themselves of the laws and markets of Florida, so as to sustain this Court's jurisdiction over Defendants.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391, *et seq.* because a substantial part of the events or omissions giving rise to this claim occurred in the state of Florida. Additionally, venue is appropriate for the claims arising out of Florida's Deceptive and Unfair Trade Practices Act because the statute applies to any company engaging in any of the activities regulated by the Act within the State of Florida.

## PARTIES

10.      Plaintiff, Tim Chapman, is and, at all relevant times hereto was, a citizen and resident of Florida. Specifically, Plaintiff resides in Miami, Dade County, Florida. In December 1985, Plaintiff purchased a Remington Model 700 Bolt Action Rifle from Zehr's in Miami, Florida. In October 2009, Plaintiff was hunting in Immokalee, Hendry County, Florida. As Plaintiff was closing the bolt after chambering a round, the rifle suddenly and unexpectedly fired.

11.      Plaintiff, Kenneth A. Modica, is and, at all relevant times hereto was, a citizen and resident of Florida. Specifically, Plaintiff resides in Boca Raton, Palm Beach County, Florida. On or about October 2005, Plaintiff purchased a Remington Model 700 Bolt Action Centerfire Rifle from Bass Pro Shops Outdoor World in Dania Beach, Florida. On August 8, 2008, Plaintiff was boar hunting in Okeechobee, Florida. At that time, Plaintiff fired a round and ejected the spent shell. As Plaintiff was chambering another round, the rifle suddenly and unexpectedly fired.

4

12.     Defendant, Remington Arms, LLC ("Remington"), is a Delaware corporation with its headquarters/principal place of business, in Madison, N.C.

13.     Defendant Sporting Goods Properties, Inc. ("SGPI") is a Delaware corporation with its headquarters/principal place of business in Wilmington, Delaware.

14.     Defendant, E.I. du Pont de Nemours & Company ("DuPont"), is a Delaware corporation headquartered in Wilmington, Delaware. DuPont is a citizen of the State of Delaware. DuPont's principal place of business is located in Delaware, and all misrepresentations and omissions made to Plaintiff arise from a scheme or artifice devised and orchestrated primarily in Delaware. The defective Product was designed primarily in Delaware, New York and Connecticut.

15.     Defendant Remington, was, and is now engaged in the business of designing, manufacturing, assembling, distributing and selling firearms, and in this regard did design, manufacture, distribute, sell and, place into the stream of commerce, the Remington Model 700, Bolt Action Rifle including the action, fire control system, and safety, bearing Serial Number G6556125, knowing and expecting that said rifle would be used by consumers and around members of the general public.

16.     Prior to November 30, 1993, DuPont owned 100% of the stock in the company known as Remington Arms Company, Inc., now known as Sporting Goods Properties, Inc. ("SGPI").  On or about November 30, 1993, RACI (Remington Arms Acquisition Corporation, Inc.) purchased from DuPont substantially all of the income producing assets of Remington Arms Company, Inc. (now known as SGPI), including the corporate name.  The company formerly known as Remington Arms Company, Inc. changed its name to Sporting Goods Properties, Inc., and RACI changed its name to Remington Arms Company, Inc. SGPI retained certain non-

income producing assets, some with significant environmental and other liabilities such that its net worth was reduced to a small fraction of its former so that SGPI may not be able to pay reasonable judgments in this and similar litigation.

17.     At all times pertinent to this action, SGPI and DuPont were and are the alter ego of each other and in essence constitute one legal entity in which SGPI operates as a division of DuPont.  The separate incorporation of SGPI is a sham in that it is merely a corporate veil which insulates DuPont from liability for products manufactured and sold by SGPI.  DuPont exerted, and currently exerts extreme influence, complete dominion and/or absolute control over the corporate activity and function of SGPI.  DuPont's continued operation of SGPI as a separate legal entity is a subterfuge designed to defeat public convenience, justify a wrong, perpetrate a fraud and/or otherwise work an injustice on Plaintiffs herein and the general public.  The conduct of DuPont and/or SGPI has harmed or will harm Plaintiffs and the general public, justifying piercing of the corporate veil resulting in DuPont being liable for the acts and omissions of SGPI as they are in reality one legal entity.

18.     Defendant Remington, SGPI and DuPont are so intertwined contractually for the liabilities, past, present and future, of each other that they are, in fact, one entity and therefore, the corporate veils of each company should be pierced to properly ascertain the responsible parties for the allegations contained herein.  The Asset Sale/Purchase Agreement transferring the assets of SGPI to Remington and various revised or supplemental agreements spreads responsibility and authority for product liability claims among the three entities as it is unclear who bears the contractual liability for this claim.

19.     Remington and/or DuPont expressly and impliedly agreed to assume certain debts and responsibilities, including the product liability of SGPI by the terms of the Asset/Sale

Purchase Agreement as well as the continuing relationship between Remington, DuPont and SGPI.  Consequently, DuPont and/or Remington are the corporate successors to the product liability claims asserted, now and in the future, against SGPI, including this particular lawsuit.

20.     Remington continues in the design, manufacture, distribution and sale of all Remington Arms product lines including the Remington Model 700 bolt action rifle, without any significant changes.  Remington maintains the same plants, employees, organization, contracts, customers, suppliers, advertising, products and name acquired in the asset purchase.  Remington acquired the entire company from SGPI through an asset/sale purchase in order to avoid and/or limit the liability resulting from an outright purchase of the stock from DuPont.  Consequently, DuPont and/or Remington are the corporate successors to the product liability claims asserted, now and in the future, against SGPI, including this particular lawsuit.

21.     Remington, DuPont and SGPI acted fraudulently with respect to the asset/sale purchase in that its purpose was to avoid and/or limit the responsibility of DuPont and/or Remington for the debts of SGPI, particularly its product liability.  Consequently, DuPont and/or Remington are the corporate successors to the product liability claims asserted, now and in the future, against SGPI, including this particular lawsuit.

22.     At all times pertinent to this action SGPI was an agent of DuPont acting in the course and scope of its agency relationship thereby making its principal, DuPont, liable for all of SGPI's acts and omissions, either by exercising direct control over SGPI, or by adopting and ratifying SGPI's acts or omissions.

23.     At all times pertinent to this action, agents of DuPont, acting within the course and scope of their  agency relationship, controlled SGPI, thereby making SGPI's acts and omissions

7

those of their principal, DuPont, either by exercising direct control over SGPI, or by adopting and ratifying SGPI's acts or omissions.

## COMMON FACTUAL ALLEGATIONS

### WALKER FIRE CONTROL TRIGGER ASSEMBLY DEFECT

24.     The Walker Fire Control Trigger Assembly is unique to the world of firearms and is exclusive to Remington brand products.  The design utilizes an internal component known as a trigger "connector." This design feature uses this additional part which in practice and in effect creates a unique trigger design comprised of two distinctly different parts. The Trigger Connector design has not been adopted by any other rifle manufacturer.  The connector floats on top of the trigger and is not physically attached to the trigger in any fashion but rather is held in place by tension from a spring.  (See Illustration 1).  Upon pulling the trigger the connector is pushed forward by the upper member of the trigger body, which allows the sear to fall and rifle to fire. (See Illustration 2).



Illustration 1



Illustration 2

25.     The connector sits under the sear with a specified overlap of as little as 20/1000ths of an inch, which is approximately equal to one-half of the width of a dime or eight human hairs. When a rifle is fired the connector repeatedly separates from the trigger body, creating a gap between the two parts.  Because of the gap created between the trigger body and trigger connector

upon firing, field debris, manufacturing scrap, burrs from the manufacturing process, lubrication applied at the factory, other lubrication build up, or moisture can foreseeably become trapped inside the enclosed fire control housing and restrict the return of the trigger connector to proper engagement under the sear, thus predisposing the rifle to malfunction in the absence of a trigger pull. The above described conditions have been further enhanced by various interferences created between other parts that are used to comprise this fire control during their assembly. These conditions have been created as the result of loose tolerances that Remington has adopted for "ease of manufacture" but further including loose inspection practices of parts prior to their assembly as a cost saving measure on the part of the company.   (Illustration 3).  Binding created by interference with other parts of the fire control can also interfere with the return of the trigger connector to proper engagement under the sear which will create the same dangerous condition.



**Illustration 3**

26.    When the gap between the connector and trigger is large enough, thereby diminishing the engagement (overlap) of the two parts, the connector will no longer reliably

support the sear, allowing the rifle to fire without a trigger pull.  These unintended firings have been so persistant and common place that Remington has adopted acronyms for the various most common forms of malfunction that Remington itself has observed to occur, *i.e.,* Fire on Bolt Closure "FBC"; Fire on Bolt Opening "FBO"; Fire on Safe Release "FSR"; and Jar off "JO", Fire Off Safe "FOS" and "Fails to Fire."

27.     Remington engineers have testified in product liability litigation throughout the country that materials can lodge between the connector and trigger, resulting in the connector being unable to support the sear.  Indeed, Remington undertook several redesign efforts in the 1940s, 1970's, 1980s and 1990s to try to eliminate the issues associated with materials becoming lodged between the connector and trigger, or binding of the connector with other parts of the fire control.

28.     There is no engineering reason to employ a separate connector that is not physically connected to the trigger.  Indeed, no other firearm manufacturer in the world utilizes such a device and many after-market manufacturers created replacement triggers that could be used to replace the defective Walker Fire Control system that did not include trigger connectors.  Indeed, Mr. Walker himself confirmed in January 2011 that the extra connector served no engineering purpose other than to make operation of the trigger pull smoother for the user, and to reduce the manufacturing cost of the fire control.

29.     Finally acting upon information that it has had for years, in 2006 Remington created and began utilizing a new fire control system called the X-Mark Pro.  This design does not use a separate connector that is not affixed to the trigger, and forces engagement of the trigger and sear upon application of the safety.  Yet despite all of the information it has related to the thousands of complaints associated with the Walker Fire Control trigger assembly, it has not

11

undertaken a recall to replace the Walker Fire Control system with the X-Mark Pro trigger.  And making matters even worse, Remington continued to utilize the Walker Fire Control trigger assembly in some rifles after the design and manufacture of the X-Mark Pro.

### DEFENDANT'S KNOWLEDGE OF THE DEFECT

30.    Defendants designed the Walker Fire Control trigger assembly and began manufacturing and distributing firearms containing that trigger assembly in 1948.  Internal Remington documents show that almost immediately following the production of these early Walker Fire Control system firearms, Remington became aware that the firearms were firing without a trigger pull.

31.    Defendants produced several models of firearms containing the Walker Fire Control.  The vast majority of these firearms are part of the Model 700 bolt action rifle series, with over five million of these rifles having been placed into the stream of commerce since 1962.

32.    Defendants have made hundreds of millions of dollars over the last six decades through the sale of their Model 700 bolt action rifles.

33.    Defendants designed, manufactured, distributed, sold and, placed the Rifles into the stream of commerce knowing and expecting that they would be used by consumers and around members of the general public.

34.    Just six years after introducing the Model 700 bolt action Rifles to the consuming public, in March 1968 Consumer Reports wrote an article describing inadvertent discharges in the Model 700 Rifle:

> The sixth-ranked rifle, the Remington 700, exhibited a potentially dangerous flaw as first tested.  There was so little clearance between the trigger and the trigger guard that when the trigger was pulled with the safety on (something you or a friend might do when sighting down the rifle or trying it for feel), the trigger sometimes failed to return to its forward position.  <u>And with the trigger in the back position, the rifle would fire without warning the next time the safety was moved to the fire position</u>.  The malfunction

12

persisted for more than 100 firings before the trigger wore in and performed normally.  An unwary buyer might have caused a serious accident by then.

35.     According to an internal Remington memorandum, upper management at Remington expressed "extreme displeasure" to the Consumer Reports article.

36.     The warnings outlined by Consumer Reports proved true and over the past fifty years, Defendants received thousands of complaints in the form of letters, telephone calls and emails that Remington Model 700 rifles containing the Walker Fire Control trigger assembly fired without a trigger pull.

37.     In 1978, Remington's insurance company settled a personal injury case brought by John Coates for $6.8 million when he was paralyzed by an unintended firing of a Model 600 rifle.  Shortly after the settlement, Remington made the decision to recall all of its Model 600 series rifles.  The Model 600 series rifle utilized the Walker Fire Control trigger assembly and similarly employed a trigger connector.  The Model 600 rifle was not nearly as popular as the Model 700 rifles, with far fewer firearms in commerce.

38.     At the same time Defendants recalled the Model 600 rifles, and recognizing that similar unintended firings in the absence of a trigger pull were occurring across the country with its more popular Model 700 bolt action rifles, Remington contemplated conducting a similar recall of the Model 700 rifles.  Internal documents show that Remington, using self-serving conjecture and assumptions, opted not to recall the Model 700 Rifles because, of the 2,000,000 firearms that were in commerce at the time, Remington concluded that "the recall would have to gather 2,000,000 rifles 'just' to find 20,000 effected rifles in the hands of the public at that time.  To put this into perspective, this number would represent about 1 out of every 100 rifles in the hands of the public were effected with a condition that would potentially result in the rifle firing on safety release, according to Remington's own estimate at that time when they were considering

13

this recall. This decision was made in light of full knowledge that: "A common source of accidents with firearms is accidental discharge." In the same company document Remington also acknowledges that: "A safety is provided to prevent accidental discharge."

39.     Rather than take the responsible action and recall the Model 700 rifles at the same time it recalled the Model 600 rifles, Remington focused its efforts on creating a safe gun handling defense to product liability claims that Remington expected due to incidents of unintended firings that resulted in personal injury or death.  Remington modified the "10 Commandments of Gun Safety" to shift responsibility for personal injuries or death to the gun handler.   This was the beginning of a trend that Remington has followed for over forty years – blame the consumer and hide any knowledge of the Walker Fire Control trigger assembly design defect.

40.     Throughout the 1970s Remington continued to consider and develop safer alternative designs to the Walker Fire Control system.  A 1980 Firearms Research Division programs schedule lists as a "necessity" "fire control improvement" because it was "necessary to reduce product liability".  These new designs all centered on the concept of removing the floating connector and incorporating a trigger block to force full engagement of the trigger and sear. Remarkably, when it appeared that Remington was going to pull the proverbial trigger and change the defective design by including a safety that blocked both the trigger and the sear, Remington decided to put its financial interests over the health and safety of the consuming public.  On December 30, 1985, an internal document states "R & D is working on improved safety and security features which should have marketable value.  (If they don't, we ought to stop the work.)."  Unfortunately, work on the new design stopped shortly after the issuance of this memorandum.  Instead, internal hand written notes from an October 19, 1993 document titled

("Liability Point of View") demonstrate that Remington is not concerned about safety, but rather have a "readily defensible reason for departure from current design."

41.     In 1994, a jury rendered a $17 million verdict against Remington related to the Model 700 design defect.   After the verdict internal Remington documents pose a simple question: "IS THE RIFLE SAFE?"   Accountants ultimately did the math and determined that if only 30% of its customers actually returned the rifles as part of a nationwide recall of the Model 700 bolt action rifles, it would cost Remington $22 million to conduct the recall.   Remington opted against a recall.

42.     In 1995, Remington documents revealed that further efforts to redesign the Walker Fire Control trigger assembly were underway.   Unfortunately, the redesign project was doomed before it began.   Remington's Fire Control Business Contract of January 27, 1995 provided (emphasis added):

> The goal is to provide a fire control that "feels" the same to our customers yet provides additional safeguards against inadvertent or negligent discharges.

> The purpose of the redesign of the fire control is to reduce the number of parts required, lower cost and to add design characteristics that enhance the safety attributes of our firearms.

> Under "Financial Analysis," the truth is further revealed:

> This is where the rubber meets the road.   Is the project worth doing?   What are the minimum forecasts to insure profitability and does our pricing structure support these expected profits.

43.     This sentiment was echoed by Robert Haskin, Remington's former general counsel and vice-president of marketing, who testified that "[i]t was my opinion that the new product was only worth doing if we could achieve certain goals, one of which was that **it costs the same or less**, another was that we could make certain improvements on the product, which you asked me

to characterize, and I said my opinion could fairly characterized as **safety issues**." So while Remington on the one hand took the position that any redesign of the Walker Fire Control trigger assembly was focused on addressing safety issues, the reality is that when the rubber meets the road, safety would take a back seat to profit.

44.     Remington possessed clear knowledge by the late 1990s that the Walker Fire Control trigger assembly was dangerous and defective. Yet a clear decision was made that there would not be a public warning and the defective Rifles would not be recalled. Instead Remington decided to introduce a new rifle series to the consuming public – the Model 710. When designing the Model 710, Remington looked at what fire control system to employ in the new product. In 1997 the answer was straight forward – "Not the M700 fire control."

45.     An internal February 1998 memo shows that Remington considered the costs to change their manufacturing process to produce a safer trigger assembly. It was determined that to change the trigger assembly it would require "fairly substantial investments in capital and technical resources" to increase their processing capabilities in Ilion, New York. In May 1998, the new trigger design was put on hold by Remington management "until economics and [the] project is approved." Repeating its historical practice of putting profits over safety, on August 25, 1998, Remington abandoned implementation of a new, safer trigger design because of an "estimated cost increase." Instead, to "eliminate development cost and time," Remington used the unsafe Walker Fire Control mechanism in the Model 710, completely reversing its decision made just eighteen months earlier to "Not [use] the M700 fire control."

46.     During testing of the Model 710 rifle, internal Remington documents reveal that on more than one occasion during pilot testing the rifles fired upon bolt closure and fired when the safety was moved from the safe to the fire position. Despite these internal testing failures,

16

Remington introduced the Model 710 rifle to the consuming public in 2000. Remington's knowledge of the potential dangers of the Model 710 rifle were so obvious that it issued a call order to its customer service department regarding how to handle customers who call complaining of unintended firings.

47.     Following the preventable death of a 9 year old boy, Gus Barber, Remington did eventually agree to a limited safety modification program.  Young Gus died when his mother moved the safety into the off position in order to unload her rifle, which caused the rifle to discharge suddenly and unexpectedly without a trigger pull.  Gus's death garnered nationwide attention after his family became committed to seeing to it that Remington take necessary steps to prevent future needless death or injury.  Remington ultimately agreed to a safety modification program for rifles produced prior to 1982 that contained a "bolt-lock" feature, which requires the safety to be placed in the off position in order to unload the gun.  This modification program (as compared to a recall) addressed one issue with pre-1982 Rifles, the propensity of the rifle to fire when a consumer was forced to unload the rifle with the safety off.  This modification failed to address the documented defects related to the Walker Fire Control trigger assembly however. The modification simply now allowed users to cycle the bolt with the safety on.   This modification did not correct the underlying potential of a rifle firing without a trigger pull.

48.     From 1992 to 2004, Defendants acknowledge receiving 3,273 customer complaints about Remington Model 700 rifles firing without a trigger pull.  This amounts to an average of approximately five unintended firings per week for this twelve year period. On information and belief, the actual number of unintended firings for this time period is much higher because it is unlikely that every consumer who experienced a misfire would report the problem to Remington if he was lucky enough to avoid injury or property damage.

49.     In response to complaints from consumers regarding unintended firings of the Model 700 Rifle without a trigger pull, consumers were asked to return their rifle to Defendants for repair and testing.  Defendants purportedly tested the rifle, albeit using undisclosed testing procedures.  Following the testing, Defendants consistently claimed that they were "unable to duplicate" the unintended discharge, or that they were "unable to duplicate" the customer's complaint.  On information and belief, Defendants statements are false and fraudulent and made to deceive and continue to deceive consumers about the defects associated with the Rifles.

50.     On occasion, Remington has concluded a customer's malfunction was the result of the condition of the rifle, due to rust, corrosion, poor maintenance, excess lubrication or some other "abuse" of the rifle.  Remington's literature and Owner's Manuals contain no such admonitions or warnings regarding the "abuse" of Model 700 rifles or the consequences that may result in dangerous malfunctions.  On the contrary, some Owner's Manuals issued by Remington specifically state, "The firearm will fire when the trigger is pulled."   There is no warning or instruction that any such "abuse" or any other condition of the rifle will result in a firing of the rifle in the absence of a trigger pull.

### THE CNBC DOCUMENTARY

51.     On October 20, 2010, after a ten month investigation, CNBC aired a documentary entitled, "Remington Under Fire: A CNBC Investigation." The "CNBC Original documentary examines allegations that the Remington Model 700 series hunting rifle is prone to firing without pulling the trigger, and that its manufacturer, Remington, has been aware of this concern for almost 60 years. Dozens of deaths, scores of injuries, and more than five thousand customer complaints have been linked to the alleged problem. The story is told through former corporate

insiders and the company's own internal documents."[1] During the documentary, the reporter speaks to several gun owners who suffered devastating consequences as a result of the 700-series rifle, including Richard Barber, a father who has devoted his life to finding answers about the tragic death of his nine-year old son which resulted from a fire on safety release "FSR" malfunction with a Remington Model 700 bolt action rifle containing the Walker Fire Control.

52.    As part of the investigation for the documentary, CNBC interviewed Mike Walker, the Remington engineer who designed the Walker Fire Control trigger for the 700 rifle. "Walker's internal company memos, obtained by CNBC, indicate that he repeatedly raised concerns, even after he retired from Remington, about the trigger system he designed." *See id*.

53.    "Other concerns were raised as well, including one from a Remington colleague who warned in a memo, 'this situation can be very dangerous.' Walker proposed a relatively inexpensive solution, though Remington has never recalled the rifle, and insists it has no defect." *See id.* In fact, on information and belief, Remington repeatedly considered a "call back" of the 700 rifle, but decided against it.

54.    As part of its investigation for the documentary, CNBC spoke with a former Remington employee whose job involved dealing with customer complaints related to the 700-series rifle.  This former employee informed CNBC that he was instructed not to acknowledge any problem with the rifle because, if he had, he would have lost his job.

55.    Remington responded to the numerous first-hand accounts of unintended firings from the Model 700 rifle by maintaining that the unintended firings are the result of poor

---

[1] *See* Remington Under Fire: A CNBC Investigation, About the Show, http://www.cnbc.com/id/39554879/ (last visited Dec. 24, 2012).

maintenance and unsafe handling, often by inexperienced users.[2]   In fact, Remington gave a written statement to CNBC before the documentary aired. This statement, mentioned during the program, contained the following statements which Remington knew were false when they were made:

> The Model 700, including its trigger mechanism, has been free of <u>any</u> defect since it was first produced and, despite any careless reporting to the contrary, the gun's use by millions of Americans has proven it to be a safe, trusted and reliable rifle.

> Both Remington and experts hired by plaintiff's attorneys have conducted testing on guns returned from the field which were alleged to have fired without a trigger pull, and neither has ever been able to duplicate such an event on guns which had been properly maintained and which had not been altered after sale.[3]

56.     After CNBC aired the documentary, Defendants published several responses, including a website located at http://remington700.tv, an Official Statement for CNBC Program Regarding the Model 700, and a Point by Point Response to the CNBC documentary.

57.     These responses contained false and deceptive statements intended to deceive the public, including the claim that the Remington Model 700 rifle is a safe and reliable firearm that can only fire without a trigger pull where the rifle improperly modified or maintained. Specifically, Remington's responses contained the following statements that Remington knew were false:

> Recently CNBC produced an "expose" claiming that the trigger mechanism of the Model 700 rifle has a deadly design flaw.  This claim is demonstrably false. [4]

> Both Remington and experts hired by plaintiff attorneys have conducted testing on guns returned from the field, which were alleged to have fired without a trigger

---

[2] Remington Point by Point Response, http://www.remington700.tv/fileadmin/pdfs/point-by-point-response.pdf (last visited Dec. 24, 2012).
[3] Remington Arms, Official Statement for CNBC Program Regarding the Model 700, submitted September 7, 2010, http://www.remington700.tv/fileadmin/pdfs/OfficialStatement.pdf. (last visited Dec. 24, 2012).
[4] Remington Point by Point Response, http://www.remington700.tv/fileadmin/pdfs/point-by-point-response.pdf (last visited Dec. 24, 2012).

pull, and neither has ever been able to duplicate such an event on guns which had been properly maintained and which had not been altered after sale.[5]

Each of the tragic and emotional personal injury and death cases cited by CNBC involve a breach of one or more important gun safety rules:

> Failure to keep the rifle pointed in a safe direction

> Failure to properly maintain the rifle

> Altering the rifles trigger mechanism

> Failure to have the safety engaged when not actively engaged in firing the rifle.[6]

The Barber rifle had been modified in multiple ways and poorly maintained (rusted action). Even so, in testing by experts for both Remington and the Barber family, the Barber rifle would fire only by pulling the trigger while the safety was in the fire position.[7]

The truth about accidental discharges is clear. These things don't go off by themselves. [8]

> The Model 700, including its trigger mechanism, has been free of any defect since it was first produced and, despite any careless reporting to the contrary, the gun's use by millions of Americans has proven it to be a safe, trusted and reliable rifle.[9]

**No scientific test has ever supported the accidental discharge theory of plaintiffs' lawyers and their expert.** That's true, even with a gun at the center of the CNBC report. The reporter tells the compelling story of the Barber family, who lost their son in a hunting accident a decade ago.

---

[5] Remington Point by Point Response, http://www.remington700.tv/fileadmin/pdfs/point-by-point-response.pdf (last visited Dec. 24, 2012); *see also* Remington Arms, Official Statement for CNBC Program Regarding the Model 700, submitted September 7, 2010, http://www.remington700.tv/fileadmin/pdfs/OfficialStatement.pdf. (last visited Dec. 24, 2012).

[6] Remington Point by Point Response, http://www.remington700.tv/fileadmin/pdfs/point-by-point-response.pdf (last visited Dec. 24, 2012).

[7] Remington Point by Point Response, http://www.remington700.tv/fileadmin/pdfs/point-by-point-response.pdf (last visited Dec. 24, 2012).

[8] Remington Point by Point Response, http://www.remington700.tv/fileadmin/pdfs/point-by-point-response.pdf (last visited Dec. 24, 2012).

[9] Remington Point by Point Response, http://www.remington700.tv/fileadmin/pdfs/point-by-point-response.pdf (last visited Dec. 24, 2012).

But the show never reveals the condition of the gun, which experts found was heavily rusted, with the trigger engagement screw, safety lever, and fire control mechanism all adjusted, or removed and reinstalled.

The gun fired only when the safety was in the fire position and the trigger was pulled, exactly as it was designed to do.[10]

58.     In these responses, Defendants continued to fraudulently, deceptively and falsely state that Remington rifles containing the Walker Fire Control system can only fire without a trigger pull when they are improperly modified or improperly maintained.

59.     According to public records, there have been more than 140 lawsuits filed against Defendants involving serious injury or death as a result of a firing in the absence of a trigger pull of Remington bolt action rifles containing the Walker Fire Control.

## CLASS ACTION ALLEGATIONS

60.     Plaintiffs bring this class action pursuant to Federal Rule of Civil Procedure 23, and case law thereunder on behalf of themselves and all others similarly situated, with the Class defined as follows:

> **All individuals in the State of Florida that own a Remington Model 700 Rife with a Walker Fire Control Trigger Mechanism.**

Excluded from the Class are: (a) any Judge or Magistrate presiding over this action and members of their families; (b) Remington Arms Company, LLC, and its subsidiaries and affiliates; (c) all persons who properly execute and file a timely request for exclusion from the Class; and (d) persons claiming personal injuries as a result of the defect in the Remington 700.

61.     Plaintiffs reserve the right to modify or amend the Class definition, as appropriate. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can

---

[10] Chen, Joie, "*Remington's In-Depth Response to CNBC Under Fire,*" http://www.remington700.tv/#, Tr. at [00:02:25;16]; [00;13:10;08]; and [00:03:18,27].

prove the elements of their claims on a class wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims, and because this case meets the requirements of Federal Rule of Civil Procedure 23.

62.     *Numerosity*:     The Class is composed of thousands of persons geographically dispersed throughout the State of Florida, the joinder of whom in one action is impractical.  The Remington 700 has been one of the most popular guns (in terms of sales volume) in the United States. Plaintiffs are informed and believe that there are at least thousands of purchasers who have experienced the Defect and have been damaged by Defendants' conduct, as alleged herein. Moreover, upon information and belief, the Class is ascertainable and identifiable from Defendants' records or identifying marks on the Product.

63.     *Commonality*:     The critical question of law and fact common to the Plaintiff Class that will materially advance the litigation is whether the Product is inherently defective, contrary to the expectations imparted by Defendants through their representations and omissions.

64.     Furthermore, other questions of law and fact common to the Class that exist as to all members of the Class and predominate over any questions affecting only individual members of the Class include the following:

a.   Whether the design of the Remington 700 does not provide enough clearance between the sear and the trigger connector and thereby causes the Defect;

b.   Whether the design of the Remington 700 allows for excessive clearance between the sear and the trigger connector and thereby causes the Defect;

c.   Whether the manufacturing process of the Remington 700 can cause metal shavings or steel chips to become concentrated in one position and thereby causes the Defect;

d.  Whether the design of the Remington 700 allows the Defect to occur by unlocking the bolt;

e.  Whether the design of the Remington 700 allows the Defect to occur by pushing the safety to the "off" position;

f.  Whether the design of the Remington 700 rifle will fail to fire if the fire control is not consistently lubricated, especially in cold climates;

g.  Whether the Defect is caused solely by improper gun maintenance;

h.  Whether Defendants violated the Florida Deceptive and Unfair Trade Practices Act by, among other things, engaging in unfair, unlawful, or fraudulent practices in connection with the failure to disclose the material and potentially life-threatening Defect in the Remington 700;

i.  Whether Defendants have been unjustly enriched as a result of the conduct complained of herein;

j.  Whether Plaintiffs and the Class are entitled to equitable relief, including but not limited restitution;

k.  Whether the design or manufacturing of the Remington 700 can cause the Defect, and thus the rifles are not suitable for their intended use;

l.  Whether Defendants knew or should have known that Remington 700s were defective;

m. Whether Defendants had a duty to Plaintiffs and the Class to disclose the true nature of the Remington 700s;

n.  Whether Defendants falsely represented that their Remington 700 were of a certain standard, quality, and grade, when in fact, they were not;

24

o.  Whether  Defendants  concealed  material  information  regarding  the  true characteristics and defective nature of their products;

p.  Whether  Defendants'  false  representations  and  concealment  of  the  defective nature of their Remington 700s was knowing, intentional, reckless, and/or malicious;

q.  Whether  Plaintiffs  and  the  Class  are  entitled  to  actual,  statutory,  punitive, exemplary,  and/or  other  forms  of  damages,  and/or  other  monetary  relief  and,  if  so,  in  what amount;

r.   Whether Defendants breached their express warranties to Plaintiffs and the Class; and

s.   Whether Defendants breached their implied warranties to Plaintiffs and the Class.

65.   *Typicality*:  Plaintiffs' claims are typical of the claims of the members of the Class, as  all  such  claims  arise  out  of  Defendants'  conduct  in  designing,  manufacturing,  marketing, advertising, warranting and selling the defective Remington Model 100, 7mm 08 bolt action rifles with  a  Walker  Trigger  Mechanism  manufactured  from  1948  to  present  that  have  experienced  the Defect,  and  were  damaged  as  a  result.  The  universally  defective  nature  of  the  Remington  700 renders each Class member's clams, legal theory, and injury common and typical.

66.   *Adequate Representation*:  Plaintiffs will fairly and adequately protect the interests of  the  members  of  the  Class  and  have  no  interests  antagonistic  to  those  of  the  Class.   Plaintiffs have retained counsel experienced in the prosecution of complex class actions, including but not limited to consumer class actions involving, *inter alia*, breach of warranties, product liability and product design defects.

67.   *Predominance and Superiority*:  This class action is appropriate for certification because  questions  of  law  and  fact  common  to  the  members  of  the  Class  predominate  over

questions affecting only individual members, and a Class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Class is impracticable.  Should individual Class members be required to bring separate actions, this Court and/or courts throughout Florida would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments.  In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court.

### ESTOPPEL FROM PLEADING AND TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

68.     Defendants are estopped from relying on any statutes of limitation or repose by virtue of its acts of fraudulent concealment, which include Defendants' intentional concealment from Plaintiffs and the general public that their Product was defective, while continually marketing the firearm as a durable and suitable product.

69.     Given Defendant's failure to disclose this known but non-public information about the defective nature of the Product – information over which it had exclusive control – and because Plaintiffs and Class Members therefore could not reasonably have known that the firearms were defective, Defendant is estopped from relying on any statutes of limitations or repose that might otherwise be applicable to the claims asserted herein.

## COUNT I
## VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR
## TRADE PRACTICES ACT
## FLORIDA STATUTES §§501.201 *et seq.*

70.     Plaintiffs, individually, and on behalf of all others similarly situated, adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

71.     This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§501.201 *et seq.* (the "Act"). The stated purpose of the Act is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. §501.202(2).

72.     Plaintiffs and all Class Members are "consumers" and the transactions at issue in this Complaint constitute "trade or commerce" as defined by Florida Statutes §501.203(7) and (8) respectively.

73.     Fla. Stat. §501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

74.     Defendant violated FDUTPA by engaging in the unfair and deceptive actions and/or omissions as described herein by engaging in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

75.     In violation of FDUTPA, Defendant employed fraud, deception, false promise, misrepresentation and the knowing concealment, suppression, or omission of material facts in their sale and advertisement of the Product in the State of Florida.

76.     Defendants engaged in the concealment, suppression, or omission in violation of

the FDUTPA when, in selling and advertising the Product, they (1) represented that the Product was free of defects and would not fire without a trigger pull when, at best, it lacked credible evidence to support those claims, and, at worse, knew the Product was, in fact, defective in that it has the propensity to fire without a trigger pull, was not suitable to be used for its intended purpose, and otherwise was not as warranted and represented by Defendants; (2) failed to disclose to, or concealed from, consumers material facts about the defective nature of the Product; and (3) failed to disclose its own knowledge of the defective nature of the Product Defendants knew that there were defects in the firearms which would result in damage and harm.

77.     Defendants engaged in the concealment, suppression, or omission of the aforementioned material facts with the intent that others, such as Plaintiffs, Class Members, and/or the general public would rely upon the concealment, suppression, or omission of such material facts and purchase Defendants' Product with said design defect.

78.     Plaintiffs and Class Members would not have purchased the Product had they known or become informed of the material defects.

79.     Defendants' concealment, suppression, or omission of material facts as alleged herein constitutes unfair, deceptive and fraudulent business practices within the meaning of the FDUTPA.

80.     Defendants have acted unfairly and deceptively by misrepresenting the quality, safety and reliability of the Product.

81.     Defendants either knew, or should have known, that the Product was defectively designed and/or manufactured and would fire without a trigger pull, which would result in damage to property and injury.

82.     Upon information and belief, Defendants knew that, at the time the Product left

Defendants' control the Product contain the defect described herein resulting in a misfire. At the time of sale, the Product contained design and construction defects. The defects reduced the effectiveness and performance of the Product and rendered it unable to perform the ordinary purposes for which it was used as well as cause the resulting damage described herein.

83.    As a direct and proximate cause of the violation of FDUTPA, described above, Plaintiffs and members of the Class have been injured in that they have purchased firearms with the defective trigger based on nondisclosure of material facts alleged above. Had Plaintiffs and Class Members known the defective nature of the trigger, they would not have purchased Product.

84.    Defendants used unfair methods of competition and unfair or deceptive acts or practices in conducting their businesses. This unlawful conduct is continuing, with no indication that Defendants will cease.

85.    Defendants' actions in connection with the manufacturing and distributing of the Product as set forth herein evidences a lack of good faith, honesty in fact and observance of fair dealing so as to constitute unconscionable commercial practices, in violation of the FDUTPA, Fla. Stats. § 501.201, *et seq*.

86.    Defendants acted willfully, knowingly, intentionally, unconscionably and with reckless indifference when it committed these acts of consumer fraud.

87.    Said acts and practices on the part of Defendants were and are illegal and unlawful pursuant to Florida Statute §501.204.

88.    As a direct and proximate result of Defendants' violations of Florida Statutes, §501.201, *et seq.*, Plaintiffs have suffered damages. Plaintiffs are entitled to compensatory damages, including but not limited to the difference in value between the Product as it was originally delivered and as it should have been delivered, equitable and declaratory relief, punitive

damages, costs and reasonable attorney's fees.

**COUNT II**
**STRICT PRODUCTS LIABILITY**
**(DESIGN DEFECT, MANUFACTURING DEFECT AND FAILURE TO WARN)**

89.     Plaintiffs, individually, and on behalf of all others similarly situated, adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

90.     At all relevant times, Defendants were engaged in the business of manufacturing Remington Model 700 bolt action rifles with the patented Walker Fire Control, which is the subject of this action.

91.     The Product was expected to and did reach Plaintiffs and the Class without substantial change to the condition in which it was designed, manufactured and sold by Remington.

92.     The Product sold to Plaintiffs and the Class Members properties was and is defective and unfit for its intended use.  The use of the Product has caused and will continue to cause property damage and physical injury to Plaintiffs and the Class.

93.     The Product was so defective in design or formulation or manufacture that when it left the hands of Defendants, the foreseeable risks exceeded the benefits associated with the design, formulation or manufacture of Remington Firearms.

94.     At all times herein mentioned, the Product was in a defective condition and unsafe, and Defendants knew, or had reason to know, or should have known that the Product was defective and unsafe, especially when used in the form and manner as provided by Defendants.

95.     Plaintiffs and the Class Members utilized the Product for the purposes and manner normally intended.

96.      Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use and would not result in injury to Plaintiffs and Class Members.

97.      Plaintiffs and the Class, acting as reasonably prudent people, could not have discovered that Defendants' Product was defective as herein mentioned or perceive its danger.

98.      The Product designed, manufactured, warranted, advertised and sold by Defendants was defective due to inadequate warnings or instructions and/or inadequate testing.

99.      By reason of the foregoing, Defendants are strictly liable to Plaintiffs and the Class for designing, manufacturing, and selling the Product.

100.     Plaintiffs, on behalf of themselves and all others similarly situated, demand judgment against the Defendants for compensatory damages for themselves and each member of the Class, for the establishment of the common fund, plus attorney's fees, interest and costs.

## COUNT III
## NEGLIGENCE

101.     Plaintiffs, individually, and on behalf of all others similarly situated, adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

102.     Defendants had a duty to Plaintiffs and the Class to exercise reasonable and ordinary care in the formulation, testing, design, manufacture, and marketing of the Product.

103.     Defendants breached their duty to Plaintiffs and the Class by designing, manufacturing, advertising and selling to Plaintiffs and the Class a product that is defective and has the propensity to fire without a trigger pull, and by failing to promptly remove the Product from the marketplace or to take other appropriate remedial action.

104.    Defendants knew or should have known that the Product was defective, had the propensity to fire without a trigger pull, and otherwise was not as warranted and represented by Defendants.

105.    As a direct and proximate cause of Defendants' negligence, Plaintiffs and the Class have suffered actual damages in that they purchased a product that is defective and that has the propensity to fire without a trigger pull. This defect has rendered the Product valueless and has caused, and will continue to cause, Plaintiffs and the Class to incur expenses repairing or replacing the Product.

106.    Plaintiffs on behalf of themselves and all others similarly situated, demand judgment against Defendants for compensatory damages for himself and each member of the Class, for establishment of a common fund, plus attorney's fees, interest and costs.

<u>**COUNT IV**</u>
<u>**VIOLATION OF MAGNUSON-MOSS ACT**</u>

107.    Plaintiffs, individually, and on behalf of all others similarly situated, adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

108.    The Magnuson-Moss Consumer Products Liability Act, 15 U.S.C §2301, et seq. ("MMCPWA" or the "Act") provides a private right of action to purchasers of consumer products against retailers who, *inter alia*, fail to comply with the terms of a written warranty, express warranty and/or implied warranty.

109.    Plaintiffs and the Class are "consumers" as defined in 15 U.S.C. § 2301(3).

110.    Product is a "consumer product" as defined in 15 U.S.C. § 2301(1).

111.    Defendants are "warrantors" as defined in 15 U.S.C. § 2301(5).

112.   Defendants provided Plaintiffs and the Class with "written warranties" within the meaning of 15 U.S.C. § 2301(6).

113.   These written warranties include Defendant's warranty which provided with the product sold to Plaintiffs and other members' of the Class, which states that Defendant warrants to the original purchaser of a new firearm that "your Remington firearm will be free from defect in material and workmanship." In the event a defect is found the purchaser must return the gun to the factory or an authorized warranty repair center at their own cost. Defendants then have the option to" repair the defect(s) or replace the firearm at no cost to you."

114.   Defendants have failed to remedy the defects of the Product despite knowledge of its dangerous condition and propensity to discharge with a trigger pull. Additionally, several Class Members have been required to pay a fee for both shipping and a replacement trigger once they notified Defendants of the defect present in the Product.

115.   Defendants have been given a reasonable opportunity by Plaintiffs and other Class members to cure such failures and to comply with the warranty yet have repeatedly failed to so.

116.   Plaintiffs and the other members of the Class have suffered damages as a direct and proximate result of Defendants' breach of warranty.

117.   As demonstrated above, Defendants failed to comply with the terms of their warranties - written, express and implied - with regard to the Product that they manufactured, advertised, distributed, marketed and/or sold.

118.   By virtue of the foregoing, Plaintiffs and other members of the Class are entitled to an award of damages and other appropriate relief, including attorneys' fees.

## COUNT V
## BREACH OF EXPRESS WARRANTY

119.    Plaintiffs, individually, and on behalf of all others similarly situated, adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

120.    Defendants expressly warranted that the Product is fully warranted against defects in workmanship and materials under normal use and service." Defendants agreed "to repair the defect(s), or replace the firearm AT NO COST TO YOU." (emphasis in original).

121.    The Product, however, contains defects as alleged herein, resulting in a misfire when the trigger is not pulled. This defect is due to fundamental design and manufacturing errors well within the Defendants' area of experience and is present when the Product leaves the Defendants' control.

122.    When Plaintiffs made a warranty claim and provided notice to Defendants of the defects in his firearm, Defendants stated that Plaintiffs would be required to incur additional out of pocket expenses for payment of replacement trigger.

123.    Accordingly, Defendants failed to remedy the defective trigger as set forth in its warranty.

124.    The limitations of damages and the limitations contained in the express warranty provisions are harsh, oppressive and one-sided. The limitations related to the amount of damages, the type of remedies available to Plaintiffs and Class Members are unconscionable when Defendants knew or should have known that there are defects in the design and manufacturing of the Product.

125.    Upon information and belief, Defendants knew that the triggers had a history of misfires, resulting in injury, death, and damage to other property, yet Defendants failed and

34

omitted to inform its distributors, its customers, Plaintiffs and Class Members who purchased their Product.

126.    In light of the foregoing, Defendants' warranty failed its essential purpose and/or is unconscionable; therefore, Defendants' warranty with Plaintiffs and the Class was breached.

127.    Also, Defendants' failure to remedy the defective triggers and all associated damages constitutes a breach of express warranty.

128.    The foregoing breaches of express warranty at issue were substantial factors in causing damages to Plaintiffs and Class Members.

129.    As a result of the foregoing, Plaintiffs and the members of the Class have suffered damages (in the form of, inter alia, out-of-pocket expenditures for replacement of Walker Triggers) that were directly and proximately caused by the defective design and construction of the Remington Product.

## COUNT VI
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

130.    Plaintiffs, individually, and on behalf of all others similarly situated, adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

131.    At all times mentioned herein, Defendants designed, manufactured and sold the Remington Model 700 bolt action rifle with the patented Walker Fire Control, and prior to the time said Product was purchased by Plaintiffs, Defendants impliedly warranted to Plaintiffs and to Plaintiffs' agents, that the Product was of quality and fit for the use for which it was intended.

132.    Plaintiffs and Plaintiffs' agents relied on the skill and judgment of the Defendants in using the aforesaid Product.

35

133.    The Product was unfit for its intended use and it was not of merchantable quality, as warranted by Defendants, in that it had propensities to break down (i.e., fire without a trigger pull) and fail to perform and protect when put to its intended use. The aforesaid product caused Plaintiffs to sustain damages as herein alleged.

134.    Defendants designed and manufactured the Product using a defective trigger assembly. Defendants designed, manufactured, sold and placed the Product into the stream of commerce knowing and expecting that the Product would be used by consumers and around members of the general public. Defendants knew, or should have known, that its Product had a propensity to fire without a trigger pull.

135.    After Plaintiffs were made aware of their damages as a result of the aforesaid Product, notice was duly given to Defendants of the breach of said warranty.

136.    Defendants failed to provide adequate remedy and caused its implied warranties to fail of their essential purpose, thereby permitting remedy under implied warranties.

137.    As a direct and proximate result of the breach of said warranties, Plaintiffs and the Class members have suffered and will continue to suffer loss as alleged herein in an amount to be determined at trial.

138.    Plaintiffs, on behalf of themselves and all others similarly situated, demand judgment against Defendants for compensatory damages for himself and each member of the Class, for the establishment of the common fund, plus attorney's fees, interest and costs.

### COUNT VII
### FRAUDULENT CONCEALMENT

139.    Plaintiffs, individually, and on behalf of all others similarly situated, adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

140.    At all times mentioned herein, Defendants, through their experience, were in a position of superiority to Plaintiffs and the class members and as such had the duty and obligation to disclose to Plaintiffs the true facts and their knowledge concerning the Product; that is that said product was defective, had the propensity to fire without a trigger pull, and otherwise were not as warranted and represented by Defendants. Defendants made the affirmative representations as set forth in this Complaint to Plaintiffs, the Class, and the general public prior to (and after) the date Plaintiffs purchased the Product, while at the same time concealing the material defects described herein. All of these facts were material to consumers' (such as Plaintiffs') purchase decisions.

141.    The material facts concealed or not disclosed by Defendant to Plaintiffs and the Class are material facts in that a reasonable person would have considered those facts to be important in deciding whether or not to purchase Defendants' Product.

142.    At all times mentioned herein, Defendants intentionally, willfully, and maliciously concealed or suppressed the facts set forth above from Plaintiffs and with the intent to defraud as herein alleged.

143.    At all times mentioned herein, Plaintiffs and members of the Class reasonably relied on Defendants to disclose those material facts set forth above. If Defendants had disclosed the above facts to Plaintiffs and the Class and had they been aware of said facts, they would have either negotiated a lower price to reflect the risk or simply avoided the risk all together by purchasing a different rifle.

144.    Defendants continued to conceal the defective nature of their Product even after members of the Class began to report problems. Indeed, Defendants continue to cover up and conceal the true nature of the problem.

145.   As a result of the previous and continued concealment or suppression of the facts set forth above, Plaintiffs and the Class members sustained damages in an amount to be determined at trial.

## COUNT VIII
## UNJUST ENRICHMENT

146.   Plaintiffs, individually, and on behalf of all others similarly situated, adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

147.   Substantial benefits have been conferred on Defendants' by Plaintiffs and the Class and Defendants have appreciated these benefits.

148.   Defendants' acceptance and retention of these benefits under the circumstances make it inequitable for Defendants to retain the benefits without payment of the value to the Plaintiffs and the Class.

149.   Defendants by the deliberate and fraudulent conduct complained of herein, have been unjustly enriched in a manner that warrants restitution.

150.   As a proximate consequence of Defendants' improper conduct, the Plaintiffs and the Class members were injured. Defendants have been unjustly enriched, and in equity, should not be allowed to obtain this benefit.

## COUNT IX
## DECLARATORY RELIEF

151.   Plaintiff, individually, and on behalf of all others similarly situated, adopts and incorporates by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

152.   Defendants acted or refused to act on grounds that apply generally to the

Declaratory Relief Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole within the meaning of Fed. R. Civ. P. 23.

153.    Plaintiff seeks a declaration that:

      a.      All Remington Model 700 bolt action rifle with the patented Walker Fire Control have defects which cause them to fire without a trigger pull;

      b.      All Remington Model 700 bolt action rifle with the patented Walker Fire Control have a defect in workmanship and material that causes failures;

      c.      Defendants knew of the defects in their Remington Model 700 bolt action rifle with the patented Walker Fire Control; and

      d.      Defendants shall issue a recall of all Remington Model 700 bolt action rifles with the patented Walker Fire Control.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, Tim Chapman and Kenneth A. Modica, on behalf of themselves and all others similarly situated, pray for a judgment against Defendants as follows:

A.    Enter an Order certifying the proposed Class (and subclasses, if applicable), designating Plaintiffs as the named Class Representatives of the Class, and designating the undersigned as Class Counsel;

B.    Declare that Defendants are financially responsible for notifying all Class members of the problems with the Remington Model 700 bolt action rifle with the patented Walker Fire Control;

C.    Enter an Order enjoining Defendants from further deceptive advertising, marketing, distribution, and sales practices with respect to the Remington Model 700 bolt action rifle with the patented Walker Fire Control, and requiring Defendants to repair and/or replace

Plaintiffs' and Class members' Remington Model 700 bolt action rifle with the patented Walker Fire Control with a suitable alternative rifle of Plaintiffs' and Class members' choosing;

       D.      Enter an award in favor of Plaintiffs and the Class that includes compensatory, exemplary or punitive damages, and statutory damages, including interest thereon, in an amount to be proven at trial;

       E.      Declare that Defendants must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale of the Remington Model 700 bolt action rifle with the patented Walker Fire Control, or order Defendants to make full restitution to Plaintiffs and the members of the Class;

       F.      Enter an award of attorneys' fees and costs, as allowed by law;

       G.      Enter an award of pre-judgment and post-judgment interest, as provided by law;

       H.      Grant Plaintiff and the Class leave to amend the Complaint to conform to the evidence produced at trial; and

       I.      Grant such other or further relief as may be appropriate under the circumstances.

## **<u>DEMAND FOR JURY TRIAL</u>**

       Plaintiffs, Tim Chapman and Kenneth A. Modica, hereby demand a trial by jury on all claims so triable.

Dated: December 31, 2012          By:    /s/ Jordan L. Chaikin       
                                 Jordan L. Chaikin
                                 Florida Bar Number 0878421
                                 **Parker Waichman LLP**
                                 3301 Bonita Beach Road, Suite 101
                                 Bonita Springs, Florida 34134
                                 Telephone: (239) 390-1000
                                 Facsimile: (239) 390-0055
                                 Email: jchaikin@yourlawyer.com

                                 Jon D. Robinson
                                 Christopher Ellis
                                 **Bolen Robinson & Ellis, LLP**

202 South Franklin, 2nd Floor
Decatur, Illinois 62523
Email: jrobinson@brelaw.com
        cellis@brelaw.com

John R. Climaco
John A. Peca
**Climaco, Wilcox, Peca, Tarantino &
Garofoli Co., LPA**
55 Public, Suite 1950
Cleveland, OH 44113
Email:  jrclim@climacolaw.com
        japeca@climacolaw.com

Richard Arsenault
**Neblett, Beard & Arsenault**
2220 Bonaventure Court
Alexandria, LA 71301
Telephone: (800) 256-1050
Email:  rarsenault@nbalawfirm.com

Eric D. Holland
R. Seth Crompton
**Holland, Groves, Schneller & Stolze,
LLC.**
300 North Tucker Boulevard,
Suite 801
St. Louis, MO 63101
Tel: (314) 241-8111
Fax: (314) 241-5554
Email: eholland@allfela.com
        scrompton@allfela.com

Charles E. Schaffer
**Levin, Fishbein, Sedran & Berman**
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106
Telephone: (215) 592-1500
Facsimile: (215) 592-4663
Email: cschaffer@lfsblaw.com

Richard Ramler
**Ramler Law Office, P.C.**
202 West Madison Avenue
Belgrade, Montana 59714
Email: richardramler@aol.com

41

Timothy W. Monsees
**Monsees, Miller, Mayer, Presley & Amick, P.C.**
4717 Grand Avenue, Suite 820
Kansas City, Missouri 64112
Email: tmonsees@mmmpalaw.com

*Counsel for Plaintiffs*